May it please the court, Benjamin Compton here on behalf of the appellants, Manuel Garcia, Sherman Ma, and Rick Wolfington. I'd like to reserve two minutes of rebuttal, if I may. Okay, and we'll try to help you, but keep your eye on the clock, okay? Thank you, Your Honor. Your Honors, summary judgment is not at all appropriate in this factually intense employment discrimination case. The appellants presented evidence showing that they were treated different than non-minorities. They presented evidence showing that the police department violated custom and its past practices in making these employment decisions. And there are major issues about the honesty and credibility of the key decision makers and the reasons they gave for the employment decisions. Who are the decision makers here? Are they the same on all three cases? Well, there is a linchpin in this case. Captain David Fudge is one of the key decision makers. Chief Atwood is one of the key decision makers. And Chief Scharf, who pres... But in all three cases, we have the same decision makers? Your Honor, in essence, we have in this case three cases folded into one. We have the case of Manny Garcia. I think that makes it difficult, by the way. In what sense, Your Honor? In a sense of trying to separate out each of the cases. Yes, I believe that the court should look at each of the cases individually and distinctively in evaluating the case. But the court should also note that the evidence in support of one of the cases, for example, Manny Garcia, also lends credence to the other cases in the sense that Captain Fudge was the evaluator of Manny Garcia. He's the bad actor that we elected. You want us to meld these together? You want us to conflate all three cases rather than individually analyzing them under McDonnell Douglas? Well, first of all, Your Honor, yes, I believe that the court should absolutely look at the cases individually and distinctively. What I'm saying is only this, that some of the evidence in support of some of the cases might also support the other plaintiffs or the appellate. You're asking us to do that? I'm asking the court to look at the evidence fully that we presented to the trial court and to this court and look at the cases individually. Okay. But I thought you were just saying that you want us to basically weigh the evidence, again, in one of the cases and apply it to the other two or the other one. Is that what you're saying? All I'm saying, Your Honor, is that the court is free and should, as we argued, look at the treatment of Manny Garcia, for example, and that should be considered in respect to Rick Wolfington's case, for example. Credibility issues, rampant credibility issues regarding Captain Fudge should also be considered in evaluating. Counsel, here's what I'm struggling with. I appreciate the fact that all of your clients feel that they have been discriminated against and they may or may not have a case, but each of them individually has the burden. You have a burden of showing the prima facie case. The city has the burden of showing a legitimate, in quotes, business reason for what it did, and then you have to show pretext, and each case is different. For example, in the case with Wolfington, they claim they didn't know that your client was a Native American. They didn't know that. I saw no evidence anywhere that says that they did, and yet that's the linchpin of that case, is it not? What does that have to do with Garcia? Well, a couple different points, Your Honor. Okay. First of all, in respect to your earlier comments, we disagree, and we have put before the court ample authority showing that, no, the plaintiffs below can use the McDonnell-Douglas burden-shifting scheme if they choose. It's but one tool in the bag to employ in appropriate circumstances. The plaintiff is free to disregard that test, and that's what- Okay. So we're not deciding this under McDonnell-Douglas? We are deciding that we have argued McDonnell-Douglas in respect to the failure to promote Ma, Sherman Ma. Only Ma. Otherwise, you apply the discriminatory motive case. Yes, Your Honor. And what's the difference? The difference- I mean, is that outcome determinative here? I would like to address a former question just real quick. There is, Your Honor, evidence that Captain Fudge knew that Rick Wolfington was Native American. We set forth a bunch of evidence in that regard. The trial court did find- I asked you who the decision-maker was. But Captain Fudge was not the decision-maker. You're asking us to apply a Title VII case that was done in a different context to impugn or to transfer his knowledge to the Captain or to the Chief Atwood here in this case. Yes, Your Honor. I know. So we've never done that in this kind of case before, have we? I understand that the court has repeatedly said that it analyzes these kinds of employment decisions, regardless whether they're brought under 1981, 1983, Title VII, the Equal Employment Clause, in the exact same way. And so that's what we're asking the court to do here, that there's ample evidence showing that Captain Fudge was behind the decisions to not promote, if we're talking about Wolfington, Wolfington to the lieutenant position. There's ample evidence in that regard. Well, there's evidence, too, though, that Captain Fudge tried to help Wolfington at some point in time. Well, that's not determinative, Your Honor. The defendant will always set forth a legitimate non-discriminatory reason. They'll always say, well, this particular person had some sort of performance issues, and look, we evaluated him favorably in some regards and not favorably in the others. It is not our burden whatsoever, and the case law is clear on this point, to disprove each of the so-called non-discriminatory reasons presented by the defense. We don't, in fact, need to disprove any of them, so long as we can point to other evidence that gives rise to a reasonable inference that a significant factor was the person's race, the plaintiff's race in this case. Can you answer my question and then go back to answering my question? Yes, Your Honor. Would you please remind me what your question is? Sure. Why is the different or whichever test we use outcome determinative, or is it outcome determinative? It may or may not be outcome determinative. Our issue with the McDonnell-Douglas test as applied here is simply this, that not all cases fit nicely within that framework, and sometimes the trial court will end up reviewing the same evidence over and over and will focus too much on the so-called legitimate reasons given by the defense, and that's what we think the trial court did here, Your Honor, is that it did not draw all inferences in favor of the appellants. Let's talk about the facts, then, because I think your time is whittling away. And so with respect to Ma, what's your best evidence that there was a discriminatory motive or pretext? Yes, Your Honor. So we're going to skip over the prima facie case. Because of your time, I think that's giving you the benefit of the doubt here. Give me your best on why there was a discriminatory motive. Okay, Your Honor. Mr. Ma established a prima facie case by showing that he's Asian American, and despite ranking number two and then number one on the eligibility list for promotion, he was repeatedly skipped over in favor of Caucasian officers. Now, the defendants say that, well, Ma didn't interview well in these completely subjective chiefs interviews in 2010 and 2010. He acknowledged he didn't interview well. Well, that's an issue in dispute, Your Honor, and, in fact, not dispositive. How is that in dispute when there's a communication from him that says, I know I did poorly. In fact, he's asking the chief, hey, tell me how I can do better. What do I need to do to kind of get out of this whole poor interview sort of status that I'm in? In a reply brief, Your Honor, yes, he did send an e-mail to Chief Atwood saying, I didn't interview well and seeking her assistance. The deposition testimony of him further says that he didn't believe himself that he didn't interview well. That's what he was told by Chief Atwood. And whether or not he thought that anyway, which he didn't, and the record shows that he didn't believe that, he was just told that, that doesn't decide or is determinative of this case. And I would like to walk the court. And then let's talk then about his supervisory experience. I think he was also told that if he wanted to be, you know, really a serious candidate, maybe he should try to get supervisory experience by applying for these master position, master chief or sergeant positions. Master police officer position. Yes. Yes, Your Honor. And he didn't. That's correct. That's correct. First of all, I just want to highlight that the defense does not prevail if it can point to one legitimate reason. No. There can be multiple. I'm pointing to a couple. This is your chance to respond. So if you say that's correct, he didn't apply for opportunities that he was told he should, and then he doesn't get it after that, where is the discriminatory motive? Here it is. It's in all the pretext. And I would like to walk the court through this in respect to the MPO position that you were just discussing, Your Honor. First of all, there's evidence showing that that didn't make a difference in Atwood's decision whatsoever, right? Ma repeatedly sought to be appointed to a long- or short-term acting sergeant position by order of the chief. Chief Atwood testified that an MPO position gives a candidate experience because they get in that position to be an acting sergeant. Yet she, Atwood, repeatedly denied Ma's known request to be made an acting sergeant, instead questionably appointing an officer who failed the promotional exam, which was in violation of the department's past custom to appoint an officer that's on the eligibility list. So we show that the MPO position didn't matter. She then appointed another person to the MPO position, a Caucasian, who had known deficiencies. And there's ample evidence of pretext also, and I'd like to walk the court through that. Let's go to Garcia. You have three people here. Let's go to Garcia. Give me your best evidence on why there was a discriminatory motive with respect to Mr. Garcia. With respect to Mr. Garcia, there's discriminatory motive in a variety of ways. First of all, this was the first demotion of any officer who had been promoted to lieutenant in the known history of the department. And it was done based entirely on the evaluations of David Fudge, who has a history of race discrimination, and for which a jury found him and the city liable in the past. He treated Garcia differently than other Caucasian lieutenants. His whole demeanor, his tone of voice, his condescending dismissive belittling of Garcia. The department refused to allow an independent evaluation of Garcia's performance or to extend his probationary period like they had done in a Caucasian. Well, he was put on a performance improvement plan, from what I recall, because he had trouble with the paperwork. Now, I want to know more about that. What was the trouble with the paperwork, from your view, and why was that pretextual? With the paperwork? It seems like that was the main reason why they put him on a performance improvement plan. Yes, Your Honor. It does seem like that was the main reason. And first of all, Garcia does contest in detail many instances where he claims that Fudge misrepresented the events that he set forth in his evaluations that ultimately led to this development plan that was done late in violation of department policy, that Fudge misrepresented and exaggerated the number of deficiencies in regard to the paperwork, that he included events that occurred outside the probationary period in violation of policy. But importantly, he contests the factual underlying bases of these evaluations, saying Fudge is misrepresenting these issues in the evaluations. And, Your Honors, I really do encourage you. Our briefing does clearly lay out all the reasons that we think that there is pretext for all the cases. I don't have to save any of your time. It's up to you. But you've got a minute. I would like to reserve the balance of my time, Your Honor. Okay. Very well. We'll hear from the city. Good morning, Counsel. Good morning, Your Honors. James Sanders for Appalese, the City of Everett, former Chief of Police Kathy Atwood, and current Captain David Fudge. May it please the Court. Let me start talking about the standard that was presented and argued because it does make a difference. I wouldn't say it's outcome determinative because summary judgment was appropriate regardless of the standard. But if, in fact, appellants decide to do away with the McDonnell-Douglas test, they have no chance of prevailing at trial. McDonnell-Douglas gives them, or at summary judgment, McDonnell-Douglas gives them a presumption, a rebuttable presumption of discrimination. Without McDonnell-Douglas, they do not have a rebuttable presumption of discrimination. And they need that in this case because we've got three different plaintiffs, roughly a dozen different decision-makers, a very ample record that was fully litigated, and there is not a single instance anywhere in this record of a single one of these 12 or so decision-makers ever saying anything that evidenced a discriminatory bias towards Chinese Americans or Asian Americans or Native Americans or Mexican Americans. There's not a single shred of evidence of anyone ever saying anything like that. There's no direct... Your opposition suggests that in a 1991, I don't remember he mentioned 1991, but in the earlier trial that Fudge had been found guilty of discrimination. My record shows that they didn't find that he took any discriminatory action. Is that correct or is he correct? Your recollection is correct, Your Honor, and that highlights an issue that I would urge, and frankly it seems like the panel has done that already, but I would urge the panel to look closely at the record and not so much as what is alleged in the briefing and here at oral argument. There is no evidence in the record that David Fudge has ever indicated any sense of racial animosity towards anyone. He had a citizen complaint from an African-American citizen many, many years ago where there was no finding of anything improper. Now, can I ask you a question about the rule of three, which is very puzzling? And as I understand it, the civil service rule was in a situation where there are concurrent openings. The city developed its own version of that particular rule. You want to walk me through that? I don't think that's correctly stated, Your Honor, or is supported in the record. The way the rule of three works is at any time for any individual decision for a promotion, there must be three candidates to choose from. So if you have four people on the eligibility list and two openings, you have to add other people to the list as soon as you run out of it. So you could actually, with four, you actually could get there. But at a certain point, you have to add people to the eligibility roster because every time you make an individual decision that somebody is going to be promoted, there must be two other people that are being considered for that same decision, and that happened in every single one of these instances. People are drawn from the civil service exam. Exactly. Scores. Well, it's not just scores, Your Honor. There are other factors that come into play as well, including seniority. Sergeant Garcia, for example, got a significant bump in his position by virtue of his seniority with the department, and so there are other factors that come into play as well. It's test scores. There's some oral examinations.  Do I understand that there's a case called Hellam that you follow in applying this rule of three? Is that correct? There's a Washington State court that confirmed that this is how it works, right, and it's also in the civil service rules. And your perspective is that the city did comply with Hellam? Absolutely, Your Honor. How did he do that? How many openings were there, and how did the list work? Well, I think it comes into play most significantly in the case of Sergeant Wolfington and his promotion because he was low on the original list. He's on the list that Sergeant Garcia was promoted from. He's lower on the list than Sergeant Garcia and is not promoted when Sergeant Garcia is promoted. But when he comes up later, there aren't enough people on the list, and so they add other people to the list, and then Sergeant Phillips was promoted instead of him. But you are making, when there are concurrent openings, you're making the decisions contemporaneously or simultaneously as opposed to one by one. Now, if you did it one by one, the rule would require that you bump up people. If you do it simultaneously, then you interpreted the rule to double. You could meet the rule or satisfy the rule by doubling the number of positions. You'd still have to take each selection from the top three candidates, right? So decisions can be made at once, but they still have to be done seriatim in terms of the actual decision. When you make a decision, there's got to be two people also in that pool for that person. So you couldn't go down to number six, for example, because you had one, two, and three. When you made your third selection, you would have to have at least two other people still remaining in the pool. Do I understand correctly that under HELM, as long as you have the three people selected, you could conceivably have one person that was in the group of three repeatedly and not be selected, so long as it's not discriminatory, and still comply with HELM. Is that correct? That is correct. That is correct. There is no guarantee that because you get on the list or because you have a particular placement on the list. But the first person selected is selected from the first three names. Always. Always. Whoever the top three at the list. And then when that person is taken out, do you put her number four? You add one person, and then you make the decision again, and then you add another person, and you make the decision again. And that's what HELM, according to you, provides, and that's what the rule provides. And that's what was done in this case. I mean, it is critical, I think, to a functioning department. And this is, for perspective here, we're talking about the police department. One of the most important functions that our government does, leadership within the police department, is very important. The rule of three provides that you always have candidates to choose from. It's not an automatic selection process. So the interview process, then, is the only thing, then, that the police, the people who are decision makers, have to decide on? Certainly not, Your Honor. The department has roughly 200 employees, and they know each other. A lot of these people have been here forever. Chief Templeman, right now, the current chief of police, who was involved in most of the decisions in this case, by the way, Asian-American, he started as a city employee, then joined the police department as an officer, then became a sergeant, then became a lieutenant, then became a captain, then a deputy chief, and then finally the chief. I mean, they know each other. So there's other things that come into play as well. It's your personal experiences with the officers, their performance reviews, people in the leadership roles, people that are making these promotional decisions, review performance evaluations. So there are many things that come into play in addition to the interview and the test. Well, that cuts both ways when we're looking at these kind of cases. Well, no, I do agree with that. Usually, I would think an interview will not disqualify somebody for being promoted, but this was an exceptional case. So let's talk about each of them, like I did with your colleague across the bar here. So with respect to Mr. Ma, it sounded like he had a poor interview. He acknowledged he had a poor interview, and that was enough? Well, it was an exceptionally poor interview, Your Honor. Every single member of the panel thought it was one of the poorest interviews that they had ever seen. And the actual details of what was said are largely not in dispute. You can look at Officer Ma's testimony. It's at the further excerpts of record, 118 to 133. Most of the very same things are discussed, but there's one in particular I want to highlight, because this was, at least in Chief Templeman's mind, the most significant issue. When you're promoting an officer to the sergeant position, they are now making a transition to no longer be a peer or a buddy of their coworkers, and they're now going to be a leader. And one of the things that Officer Ma stated during the interview when he was asked about an example of when he had shown leadership was that he had observed another officer do something that was inappropriate per the policy, and then he advised that officer, and this is his own words from his deposition, how to perform his duties in a way so he, quote, wouldn't be focused on. He also described it as how to perform his duties without drawing attention to himself and to avoid being under scrutiny. That's all from his deposition testimony. And in Chief Templeman's view, that was one of the most significant issues because he's got to be a leader. He's got to enforce rules. He can't be telling people how to cover it up. Mr. Compton also referenced that someone was appointed over him who had failed an eligibility exam. Can you talk to me about that? There's no evidence of that in the record, Your Honor. Okay. Let's move on to Mr. Garcia. Okay. Mr. Garcia, I think similar to... Yeah, but similar, we don't have a whole acknowledgment or a whole universe of officers, decision-makers saying he had the worst interview. Here it was about paperwork. I'm trying to figure out exactly what's going on here. Can you talk to me? Because, I mean, he was put on a performance improvement plan because of paperwork? Well, every sergeant that's promoted to lieutenant has a 180-day probation period. Now, Sergeant Garcia was promoted by a panel that include then-Chief Scharf, Deputy Chief Kathy Atwood, who later became chief, and also Dan Templeman. Those were the three people that made the decision to promote him. He was then put through the probation period just like everybody else, and you can see there's a very thorough record. It's at excerpts of record 10, starts at 1088, and it goes to 1126. Three very thorough written evaluations of how he's doing during the probationary period. And paperwork certainly is one of the issues, and it's an important issue for lieutenants because they're now at the role where they're sort of administratively running. We're talking about the first demotion, though, in the department here. So, I mean, it seems a little suspect. It is the first time that somebody did not pass the probationary period, but the details and the specifics are very significant. There are multiple instances, and these are detailed instances that are not disputed in the record. There are multiple instances where Sergeant Garcia is turning in paperwork, missing forms, missing pages, missing signatures, and it happens over and over and over again, and it continues to happen until the 180-day period is over. Now, at a certain point, you have to rely on a lieutenant to be able to perform these basic functions of their job without worrying that they're always going to get it wrong. Sounds like, though, from everybody's, all the plaintiff's perspective, Mr. Fudge was an instigator in a lot of ways and seemed to be all around these three individuals' application. Again, that can cut both ways. Talk to me about your best argument regarding what is alleged about Mr. Fudge should not be considered or should not go toward the discriminatory motive that we have to turn to. I would propose that Captain Fudge's focus is more a lawyer choice than it is reflective of the record or what's actually happened in reality. Now, Captain Fudge had just been promoted to captain when he took over Sergeant Garcia, then Lieutenant Garcia, during his probationary period, and he is, the record is undisputed. Captain Fudge is a tough grader. He is a tough commander. He has very high expectations from everybody. There are multiple, multiple instances of the record where witnesses confirm this. So what happened to Sergeant Garcia has happened to everybody else. Now, his case was consequential, absolutely. He lost a promotion. But there is no real dispute about whether or not Captain Fudge was correct or not and the concerns he had. Those were real concerns. What role does he play? Because there's a focus on Fudge, but we've got three different cases. Who are the decision makers in each of these cases that we have to focus to see whether there was a discriminatory motive? Well, let's start with Sergeant Garcia because we're focusing on that right now. Captain Fudge is not a decision maker in that case. Sergeant Garcia is promoted by then Deputy Chief. We're running out of time. Run through each of them. Sure. Real quickly. Captain Fudge is not a decision maker. He provides input through the process, including the performance development plan. But Dan Templeman, current chief, is also involved at every step of the way and, in fact, is meeting with Sergeant Garcia every week during the last weeks of his probationary period. You also have Kathy Atwood's declaration where she says she was apprised consistently throughout the period of what was going on and had a chance to look at it and see what was going on as well. They made the decision that Sergeant Garcia would be more successful continuing as a sergeant rather than as a lieutenant. So Fudge did not make the decision with respect to Garcia. He had input but did not make the decision. He had input but did not make the decision. And regarding Sergeant Wolfington, again, Captain Fudge had no involvement whatsoever in the promotional decision. The claim is that he had input, but that's not supported in the record. He wasn't even involved. He was Sergeant Wolfington's supervisor for a very brief time. Atwood was the decision maker. Atwood was the decision maker. And as regards to Sherman Maugh, Sergeant Garcia is not involved. I'm sorry. Captain Fudge. There are so many names. Captain Fudge is not involved in any way, shape, or form with Sergeant Maugh's decision. Never supervised him. He was never involved in any way. Kelly Carman was promoted over Mr. Maugh. When was she promoted? Ben, do you remember? Was she 2012 or 2010? 2012. This was when Officer Maugh had not done the things that Cathy Atwood had asked him to do. And that was after meeting with him to talk about what he needed to do to do better, right? Well, this was subsequent to that, right? He has his first interview, does very badly. She meets with him, gives him pointers. He doesn't follow them. They have a second opportunity where they consider him for promotion. They interview him again. Can you explain to me then why there are two eligibility rosters for Sergeant with overlapping applicability dates for that time period? The first list, it's at ER 1159, has Mr. Maugh ranked second, and Ms. Carman is not listed. The second list is at 1160, has Ms. Carman ranked first, and Mr. Maugh is not listed. And I was just kind of confused with these two lists and the overlapping applicability dates. I remember. There was a subsequent list generated because they had run out of eligible candidates, and Officer Maugh was, as a courtesy, was put back on the list to allow another chance for supervision. But this was a second entirely new list that was generated after a second round of testing. Any other questions? I do. I'm sorry. I know we have gone a little bit over. I have a couple of questions. So does the department, besides putting someone on a performance improvement plan, do they do anything to help people get through from Sergeant? I imagine diversity is important, I would think, to City of Everett. Absolutely, Your Honor. And in this particular case, the performance improvement plan was exactly that. And every week, every week, Captain Fudge and then Deputy Chief Templeman sat down with Sergeant Garcia, Acting Lieutenant Garcia at the time, every week they met with him to go over things to help him. And he did actually improve in a lot of areas throughout the course of the probationary period. So they worked very aggressively with him. But he never got to the point where they felt like they could actually trust him unsupervised to get the administrative details of the job done right. And that's critical, critical in policing. The other thing, even though Mr. Fudge wasn't a decision-maker, it seems like he was giving Mr. Garcia a hard time. You said that he's just a hard person. If we take the allegations as true, it seems, you know, one perception is that he was giving him a hard time. I see you smiling, so I would hope you'd have a serious response. No, no, it's a serious question, Your Honor. Captain Fudge, there are multiple instances in the record where Caucasian officers also said, Captain Fudge is very tough. He is very tough. But sometimes that's what you want in an officer in the police. He is a very tough commanding officer. And Caucasians say that just as much as Sergeant Garcia. And I apologize, I have just one last question. Mr. Compton argues in his brief that we should apply, I think it's the Straub case, the U.S. Supreme Court case where we use the fact that Mr. I hear he's arguing that Mr. Fudge knew about the Native American status of Mr. Wolfington and go ahead and assign that to Captain Atwood based on this Straub versus Proctor. A cat's paw theory, Your Honor? Yes. I do think that's the argument. There's no evidence in the record that Cathy Atwood relied on any input from David Fudge in making her decisions. And that's what would have to happen for that to apply. Absolutely, absolutely. In addition, it's undisputed, Cathy Atwood, everybody else involved, nobody had any idea that Sergeant Wolfington identified as Native American. And nobody had any idea about the complaint he made to Lieutenant Frankowitz in terms of his retaliation. There's no evidence in the record of that at all. Thank you. Any other questions? No. Thank you, Your Honors. Thank you, Counsel. Thank you, Your Honors. I would like to address a couple different things. Counsel was a little bit loose with the record. We do cite to ER 6427 through 64310. That does show that Captain Fudge does have a history of race-based discrimination. Tell me about that. You cited this earlier case. You claimed that he was found to be discriminatory. That's not what I understood. Was he found to be discriminatory in that 1991 case? He testified that there was a lawsuit brought against him and the city of Everett and that it had to do with race discrimination, that it was brought by an African-American woman. And a jury found him and the city one-third liable for that event. That's your representation. I'm looking at this. It seems like this portion of the record doesn't state that the lawsuit resulted in a finding that Fudge took discriminatory actions against the plaintiff in that case, nor does your versea point to other evidence in the record to support his claim that Fudge has a history of a racist attitude or behavior. I'm just trying to figure out what we do with this lone citation, especially when you're alleging a known history of racist attitudes and behaviors. Your Honor, this is just one larger. So you're just talking about someone playing a little loose. I want you to address that. Okay. Well, first of all, we draw all reasonable inferences in favor of the plaintiff. Of course, at the time of trial, we'd put more evidence about this on, but that testimony from David Fudge, the reasonable inferences, yes, it is about race discrimination. That's what Ms. Breland in that deposition asked him specifically, and he said a jury found him liable for that allegation. Counsel, with respect, I think you're really distorting the record here, really. Is there anything besides that case on which you base your allegations respecting Captain Fudge's alleged racism? Well, it's all the evidence that we put forth that collects. Give me something specific. Don't play games. What specifically are you alleging? In respect to? Fudge. Besides his claim, name, date, place, time, anything where he has been shown to have racist attitudes. What are you citing? Your Honor, that is a reasonable inference based on all the testimony from Manny Garcia, the other evidence that we put in the record. We do not need to show that he made some direct statement, hey, I don't like a certain class of people. These kinds of cases are often and appropriately based on circumstantial evidence. The wrongdoer is not going to announce his or her motivations and proclaim that he harbors some sort of animosity, and the Supreme Court. I think we have your point. Any other questions by my colleague? Okay, thank you. Your time has expired. We thank both counsel for their argument in this case. The case just argued is submitted.
judges: M. Smith, Murguia, Robreno